### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### FT. MYERS DIVISION

**IN THE MATTER OF THE EXTRADITION
OF MIHAI NECOLAICIUC,**

Case No.  **2:09-mc-21-FtM-DNF**

_____

## EXTRADITION CERTIFICATION AND ORDER OF COMMITMENT

The United States commenced these extradition proceedings against Mihai Necolaiciuc (hereinafter

"Necolaiciuc") pursuant to 18 U.S.C. §3184, and the Extradition Treaty With Romania and Protocol to the

Treaty on Mutual Legal Assistance in Criminal Matters With Romania entered into force on September

10, 2007.  (See, Gov. Exh. 1[1], Declaration of Gregory B. Wierzynski, p. 1, p.7).

### I.  Procedural History

On June 23, 2009, a Complaint for Provisional Arrest With a View Towards Extradition (Doc. 1)

was filed by the United States acting on behalf of the Government of Romania.    In that Complaint, the

United States alleges that Necolaiciuc was wanted to stand trial in Romania for the crime of Abuse of

Public Office in violation of Article 248, with application to Article 41, Paragraph 2, of the Romanian

Criminal Code, as well as Misuse of Subsidies for Purposes Other Than They Were Granted under Article

10, Section C of Law 78/2000.  On August 21, 2009, the United States on behalf of the Government of

Romania filed a Request for Extradition.  (Doc. 10).

_____

[1]  The exhibits referred to in the Order were admitted during the evidentiary hearing held
on November 15-17, 2010. The page numbers refer to the Bates Stamp numbers.

1

On February 4, 2010, the United States acting on behalf of the Government of Romania filed a Superseding Request for Extradition (Doc. 57). In addition to requesting extradition for Indictments 17/P/2005 and 134/P/2005, the Government of Romania is seeking extradition predicated on a Provisional Arrest Warrant with criminal file no. 206/P/2006. (Doc. 57, p. 2). The United States alleges that between December 2001 and February 2003, Necolaiciuc is alleged to have committed the offenses of Abuse of Office Against Public Interests With Very Serious Consequences in Continued Form in violation of Art. 248 and Art. 41(2) of the Romanian Penal Code, and the offense of Using Credits for Other Purposes Than Those They Were Granted For in Continuous Form, in violation of Art. 10(c) from Law no. 78/2000 and Art. 41(2) all with the application of Article 33(a) of the Romanian Criminal Code. (Doc. 57, p. 2). The offenses are punishable by imprisonment from five (5) to fifteen (15) years and may be increased by another five (5) years. (Doc. 57, p. 2).

On June 22, 2009, Necolaiciuc was arrested pursuant to an arrest warrant issued by this Court in conjunction with the issuance of the extradition complaint. (Doc. 4). Necolaiciuc has been held without bond, pending the resolution of these extradition proceedings. On November 15, 16, and 17, 2010, this Court conducted an extradition hearing pursuant to 18 U.S.C. §3184.

## II. Allegations

The United States on behalf of the Romanian Government proffered the following evidence. After communism ended in Romania, a new government arose and the property of the prior Romanian Government remained the assets of Romania and these assets included the railway system. (Doc. 103, p. 14). Initially, the new government organized the railway system under one entity that was referred to as the National Society of CFR (Caile Ferate Romane). (Doc. 103, p. 15). In 1998, the railway system was

reorganized into separate entities or companies, SMF, CFR Marfa or Marta, CFR Calatori, SAAF, and CFR. (Doc. 103, p. 15). The charges in the instant case relate mostly to SMF, SAAF, and CFR. (Doc. 103, p. 16). However, all of these entities were overseen by the Ministry of Transports, Constructions, and Tourism and all of the assets remained the exclusive property of the Romanian Government. (Doc. 103, p. 17). Romania owned all of the shares of CFR. (Doc. 103, p. 17). These entities had general assemblies as well as boards of directors. (Doc. 103, p. 17). On July 13, 2000, Necolaiciuc became the general manager as well as the chief credit accountant of CFR. (Doc. 103, p. 16). He was also the chairman of the board for CFR. (Doc. 103, p. 17). He remained in these positions until October 21, 2003. (Doc. 103, p. 17, 26). Romania does not have any evidence that Necolaiciuc personally received any direct payments, or any payments associated with the transaction alleged in the charging documents. (Doc. 103, p. 37).

Until December 30, 2002, SMF was the entity that was responsible for the organization of tenders or offers for purchase or sale of assets associated with the national railway system. (Doc. 103, p. 18). On December 30, 2002, SMF was dissolved.

SAAF was the entity that held excess property, such as excess locomotives for the railway system. (Doc. 103, p. 18). SAAF was responsible for the management and administration of these assets. (Doc. 103, p. 18).

BRM, also known as the Romanian Stock Exchange is the entity that the Romanian Government alleged Necolaiciuc used to procure or sell assets of CFR. (Doc. 103, p. 24). BRM is not regulated by Romania, and Romania asserts that legally Necolaiciuc was required to use SMF to obtain products and services or after SMF dissolved Necolaiciuc was to procure assets in a way that was consistent with the principles announced in Governmental Ordinance 60/2001. (Doc. 103, p. 25). BRM is an unregulated company that acts as an intermediary and as a trading house. (Doc. 103, p. 25).

3

In the charging documents, Romania is asserting that Necolaiciuc did not act alone, but rather acted in concert with others.  (Doc. 103, p. 18).    Specifically, he primarily acted with Viorica Olaeru and Gabriel Misir.  (Doc. 103, p. 18).  Olaeru and Misir held positions with the Economic Department of CFR and the Trade Development Department of CFR.  Their conduct was integral to the success of the criminal activity.  (Doc. 103, p. 18-19).  The statements of the other accused individuals were also contained in the information from Romania.  (Doc. 103, p. 30).

Necolaiciuc, as general manager and chief credit accountant, had the duties and responsibilities to approve payments with respect to procurements for CFR.  (Doc. 103, p. 19).  He also was responsible for the decision whether to sell assets, and for the hiring and firing of employees as well as other duties and responsibilities of a general manager.  (Doc. 103, p. 19).

All three charging documents relate to the same type of offenses.  (Doc. 103, p. 20).  The two offenses in violation of Romanian law are translated as follows: Abuse of Office Against the Public Interest pursuant to Art. 248 of the Criminal Code, with Application of Article 41, Paragraph 2 of the Criminal Code.  (Doc. 103, p. 20); and, Using Subventions for Other Purposes Than Those They Had Been Granted, pursuant to Art. 10(c) of law 78/2000.  (Doc. 103, p. 20-21).

On February 4, 2005, Necolaiciuc left Romania via the Alvide checkpoint which lead to Moldova. (Doc. 103, p. 24).  Necolaiciuc has provided statements through his counsel to the Romanian authorities. (Doc. 103, p. 24).

The Romanian Government seized some of Necolaiciuc's bank accounts and real property and these documents support that payments were made to companies illegally.  (Doc. 103, p. 23-24).  The Romanian Government had experts compare Necolaiciuc's signature to the signature on CFR documents, and these experts determined that the signature on these documents was that of Necolaiciuc.  (Doc. 103,

4

p. 24).

### A. Summary of the Charges

A summary of the charges against Necolaiciuc are as follows.  Romania asserts that Necolaiciuc used BRM to procure and dispose of assets of CFR.  (Doc. 103, p. 24).  However, Necolaiciuc was required to use SMF to procure and dispose of assets, and after SMF was dissolved, Governmental Ordinance 60/2001 set forth the procedures for procurement and sale of assets which did not include using BRM.  (Doc. 103, p. 25). The allegations against Necolaiciuc are that he engaged BRM in contravention of the law in order to control the acquisition and sale of assets of CFR.  (Doc. 103, p. 25).  BRM did as Necolaiciuc instructed which meant that there was no free market sale and purchase of assets, and Necolaiciuc controlled the method of the procurement and sale of assets so that the assets were purchased from and sold to unsuitable companies selected by Necolaiciuc.  (Doc. 103, p. 26).  Necolaiciuc is charged with exerting his authority to infringe regulations and laws in bad faith, and issuing illegal dispositions, and threatening his staff when they tried to disobey his orders.  (Doc. 103, p. 26).

Necolaiciuc is also charged with illegally withdrawing sums of money from the budget of CFR to illegally direct these funds toward companies that would provide him with undue financial advantages. (Doc. 103, p. 26).  Sometimes he transferred sums of money without a contract to these other companies. (Doc. 103, p. 29).  Necolaiciuc is not only charged with using CFR money, but also with using money from a loan from BEI, the European Investment Bank for purposes other than flood damage reconstruction which was the reason for the loan.  (Doc. 103, p. 26-27, 36).  Necolaiciuc may not have directly transferred the money, however, he did threaten his employees requiring them to make these illegal transfers.  (Doc. 103, p. 29). The atmosphere at CFR was one of fear, threat, and pressure by Necolaiciuc.  (Doc. 103, p. 32).  Necolaiciuc ordered Olaeru to make some of these preferential payments to companies that were

ghost companies or shell corporations and were not truly functioning entities. (Doc. 103, p. 29). As a result of these criminal activities, Necolaiciuc harmed the Romanian railway of over 15 million Euro, and over 5 million Euro relating to the BEI funds that were improperly utilized. (Doc. 103, p. 30). These allegations are supported by witness statements, specifically, Orlando Craciun's statements. (Doc. 103, p. 33). Necolaiciuc told Craciun that he wanted to use the BEI funds for purposes other than flood reconstruction, Craciun told Necolaiciuc that he was not permitted to do that, and Necolaiciuc disregarded him and went forward with using the BEI funds for payments other than for which it was intended. (Doc. 103, p. 33). Romania also tracked the funds and confirmed that BEI funds were converted from Euros to leu (the currency of Romania) and used for improper purposes. (Doc. 103, p. 34). Other witness statements also support this charge. (Doc. 103, p. 34).

**B. Charges in Indictment 17/P/2005**

In Section A of 17/P/2005, Necolaiciuc is charged with having CFR enter into a 5 million Euro contract with SC General Invest for installing electrical billboards in Romanian railway stations. (Doc. 103, p. 30, 31). SC General Invest was not authorized to perform these services and its employees had no experience in installing electrical billboards. (Doc. 103, p. 30-31). This transaction occurred through BRM and not SMF. (Doc. 103, p. 30). Another company had already installed electrical billboards in two of the railway stations. (Doc. 103, p. 31). CFR had a substantial expenditure, authorized by Necolaiciuc for items that were ultimately not delivered and not necessary at two railway stations. (Doc. 103, p. 31). These allegations are supported in the witness statements. (Doc. 103, p. 32). The services were ordered by CFR but were not performed and the money that was paid was embezzled. (Doc. 103, p. 31). Therefore, in Section A of 17/P/2005, Necolaiciuc is being charged with abuse of power by using BRM instead of SMF in the procurement of electrical billboards, and with the use of subventions for purposes

6

other than intended by using the money for purposes other than it was intended.  (Doc. 103, p. 32).

Section B of 17/P/2005, relates to a contract between CFR and SC Rom Tehno Invest relating to the purchase of a railway monitoring system.  (Doc. 103, p. 34).  Necolaiciuc had contact with Dumitru Crestin who was associated with SC Rom Tehno Invest.  (Doc. 103, p. 34).  Crestin was selected as the winning bidder of an auction at BRM to provide CFR with a railway monitoring system.  (Doc. 103, p. 35). Romania investigated SC Rom Tehno Invest and discovered that it was a ghost or shell company and was formed shortly before the contract with CFR was signed.  (Doc. 103, p. 35).  After SC Rom Tehno Invest cashed the money from CFR for this contract, SC Rom Tehno Invest disappeared.  SC Rom Tehno Invest did subcontract with another company, even though this second company was never paid.  (Doc. 103, p. 35).  Payments were made from the BEI money, however, this transaction did not involve flood reconstruction.  (Doc. 103, p. 35).  The money paid by Necolaiciuc was used for the benefit of Crestin or other individuals associated with SC Rom Tehno Invest and was tantamount to embezzlement.  (Doc. 103, p. 36).

Section C of 17/P/2005 involves a transaction between CFR and SAAF.  (Doc. 103, p. 39).  SAAF obtained a loan from Banc Post SA that was secured by collateral of 1570 rail wagons, as well as accounts receivable due and owing to SAAF.  (Doc. 103, p. 39).  Necolaiciuc approached the leadership and management of SAAF and Necolaiciuc agreed to assume the loan to Banc Post SA, and then pay off the loan so that CFR would be the creditor rather than Bank Post SA.  (Doc. 103, p. 40).  Necolaiciuc used 4 million Euros of the BEI funds to pay off the SAAF loan, and the collateral and accounts receivable of SAAF remained in place.  (Doc. 103, p. 40).  Two months after assuming the loan, without authorization or approval, Necolaiciuc began to liquidate the assets used as collateral for the loan.  (Doc. 103, p. 40, 43). However, SAAF never defaulted on its loan and never transferred any assets to CFR for it to liquidate.

7

(Doc. 103, p. 40, 43).   SAAF was never consulted prior to the sale of the assets.   (Doc. 103, p. 43).   The assets were liquidated by BRM, a company that Necolaiciuc favored and were liquidated as recyclable iron rather than as the wagons themselves.   (Doc. 103, p. 44,45).   Necolaiciuc set the price of the assets.   (Doc. 103, p. 44).   According to the Romanian Government, this type of transaction violated Governmental Ordinance 60/2001. (Doc. 103, p, 45).   The Romanian Government has witness statements and bank accounts of CFR to confirm these transactions. (Doc. 103, p. 40).   In essence, Necolaiciuc took BEI funds and illegally used them to repay the loan for SAAF, then took the collateral assets and sold them for scrap and obtained the money.   (Doc. 103, p. 41).

Section D of 17/P/2005 provides that Necolaiciuc through CFR issued purchase orders to SC Total Group for the purchase of 520 electrical coupling devices.   (Doc. 103, p. 45-46). The devices were useless and not homologated or approved for use by AFER which is the entity that approves certain companies for the purchase of certain types of products.   (Doc. 103, p. 46).   The Romanian investigation determined that SC Total Group was a ghost or shell company with fictitious headquarters, and its owner, Constantin Mihairu could not be located.   (Doc. 103, p. 46).

Section E of 17/P/2005 provides that Necolaiciuc through CFR purchased 2,000 tons of diesel oil from Supermarket Roli Rom, however the investigation revealed that there was no contract for the purchase of this oil.   (Doc. 103, p. 47).   The oil was never delivered, but Necolaiciuc paid for it.   (Doc. 103, p. 47).   As the chief executive officer of CFR, it was Necolaiciuc's duty to verify the documentation associated with the purchase.   (Doc. 103, p. 47). Supermarket Roli Rom was a ghost or shell company, and was not the usual company that CFR relied upon for diesel oil.   (Doc. 103, p. 48).

Section F of 17/P/2005 involves the purchase of 100 tons of fireproof solution.   (Doc. 103, p. 48). The purchase was done through BRM, and it is alleged that a false auction was conducted regarding this

purchase. (Doc. 103, p. 48). The principals of the other companies that were allegedly participating in the auction were not in the country at the time, and therefore could not have participated in the process. (Doc. 103, p. 48). The Romanian Government found that the delivery of the fireproof solution occurred even before the auction began. (Doc. 103, p. 48).

Section G of 17/P/2005 involves the commercial relationship of CFR and SC Roza Pro Impex which is a ghost or shell company. (Doc. 103, p. 49). The transaction involved 63 railway switches. (Doc. 103, p. 50). Again, there was a supposed auction at BRM but no contract. (Doc. 103, p. 49). The other companies that allegedly participated in the auction were ghost or shell companies. (Doc. 103, p. 49). These railway switches were required to be purchased from one authorized vendor and homologated by AFER. (Doc. 103, p. 49). Necolaiciuc purchased the railway switches from a different vendor and the purchase was not homologated by AFER. (Doc. 103, p. 49). The railway switches were defective which was a major safety concern. (Doc. 103, p. 50). Romania investigated and found that the 63 railway switches were actually purchased through an entity that had acquired them as scrap or salvage for parts. (Doc. 103, p. 49). CFR paid a substantial amount of money for these defective railway switches. (Doc. 103, p. 51).

## C.  Charges in Indictment 134/P/2005

In the first Count of 134/P/2005, Necolaiciuc is charged with Abuse of Office Against the Public Interest. (Doc. 103, p. 57). The Indictment alleges that while Necolaiciuc was the general manager, and chief credit accountant of CFR he abused his office by intentionally misusing important financial resources, specifically taxes collected for use on the railway infrastructure and subventions, and sold assets as recyclable iron to the advantage of several suppliers which were private companies. (Doc. 103, p. 57-58).

9

Products such as ball bearings, stainless steel sheet metal, drills, boring machines, and pumps were acquired under emergency circumstances, however, from the witness statements, it is clear that these items were not necessary for the operation of CFR and some of the items were not usable. (Doc. 103, p. 58). Necolaiciuc approved the purchase of all of these items for unreasonable prices. (Doc. 103, p. 58). The process used by Necolaiciuc to purchase these overvalued, useless items excluded competition, and infringed legal dispositions regarding public procurement. (Doc. 103, p. 58-59). Necolaiciuc paid for these orders in short intervals through payments as well as debt transfers, claim transfers, and group compensation algorithms he signed directly. (Doc. 103, p 59).

Eventually, many of the items purchased by Necolaiciuc were sold to SC Combad, SC Yogaro, and SC Tard Invest. (Doc. 103, p. 59). Necolaiciuc ordered Misir to sell these useless products to these companies, however, if these companies were not able to sell the items within a year, then CFR agreed to take the items back. (Doc. 103, p. 59-60). These companies never picked up these items, the whole transaction was a fiction. (Doc. 103, p. 60). Necolaiciuc created this fiction to create accounts receivable for CFR, which was, in essence, an accounting trick. (Doc. 103, p. 60). None of these products were ever sold by SC Combad, SC Yogaro, and SC Tard Invest. (Doc. 103, p. 60). Necolaiciuc purchased these useless products for high prices and therefore, no one had any interest in purchasing them. (Doc. 103, p. 60). CFR retained the items, and all of the invoices were canceled, and never paid for by the buyers. (Doc. 103, p. 61). The evidence of these transaction was found in reports compiled by the Transport Ministers Control Body, and a specialist of the National Anti Corruption Directorate. (Doc. 103, p. 61). The evidence shows a case of criminal intention of favoring the interests of the supplier companies to the detriment of CFR, a public company. (Doc. 103, p. 62).

Necolaiciuc also illegally sold through BRM 23,000 functional wagons and 1,059 functional

locomotives. (Doc. 103, p. 62). Necolaiciuc sold these assets whole instead of by the part. (Doc. 103, p. 72). Even though the Ministry entered an order to sell assets of CFR, Necolaiciuc was required to follow Romanian law in selling assets, and he violated the law by using BRM and obtaining a sales price much lower than if Necolaiciuc had used a process of valuation such as a true auction. (Doc. 10,3, p. 62-63). Many of these assets were sold a scrap iron. (Doc. 103, p. 63). Also, these items were purchased one day by one company and sold the same day to another company which was in the railway business. (Doc. 103, p. 63). They were not sold at a public auction but rather through direct negotiation through BRM. (Doc. 103, p. 72). These assets were illegally sold without the approval of the board of directors or the General Assembly, CA. (Doc. 103, p. 72).

Necolaiciuc was supposed to sell these assets for the reparation of the railway, but instead he used the money to purchase useless items and subsequently attempted to sell these useless items for CFR. (Doc. 103, p. 63). Necolaiciuc forced the branches of CFR to take these useless items, and witness statements support this allegation. (Doc. 103, p. 64).

Necolaiciuc misused company assets by taking 10 locomotives and 150 wagons and giving them, for free, to a private railway operator, SC Servtrans. (Doc. 103, p. 64). Necolaiciuc was given these assets by the Ministry to reduce the cost of reparation reconstruction. (Doc. 103, p. 64). Instead, Necolaiciuc leased these items to SC Servtrans for free, and SC Servtrans made a substantial profit from leasing these locomotives and wagons over the course of a year. (Doc. 103, p. 64, 74).

Necolaiciuc received funds to repair the railway infrastructure. (Doc. 103, p. 65). Instead of using the funds for reconstruction, he purchased rose bushes to decorate the railway stations. (Doc. 103, p. 65). The cost of the rose bushes was approximately 740,000 Euro. (Doc. 103, p. 65). The roses were purchase way above the market value from SC Liana Flowers. (Doc. 103, p. 65). The investigation found the

11

amount SC Liana Flowers paid for the roses and the amount CFR paid for them, and the difference was substantial.  (Doc. 103, p. 65).

### D.  Charges in Arrest Warrant 206/P/2006

Necolaiciuc ordered that funds from the BEI loan, which were loaned for the purposes of reconstruction for flood damage, be transferred to other trade companies (66 companies were listed) and other accounts.  (Doc. 103, p. 118-119, 121).  Necolaiciuc had signed the Implementation Agreement related to the BEI financial agreement with Romania.  (Doc. 103, p. 121).  Necolaiciuc ordered the payment of invoices for the 66 companies from the BEI credit and illegally signed 70 payment orders for these items.  (Doc. 103, p. 124).

Necolaiciuc also acquired products without following the legal rules concerning suppliers, failing to have proper documentation, and ordering payments without invoices and without receiving the supplies. (Doc. 103. p. 119).  Necolaiciuc signed purchase orders for items that were not useful to the company and violated Governmental Ordinance 60/2001 regarding the procurement methods.  (Doc. 103, p. 119).  He ordered supplies without following the legal rules concerning the selection of suppliers and failed to follow other proper procedures including verifying if the goods were received.  (Doc. 103, p. 119).

### E.  Witness Statements

The Romanian Government provided witness statements to support the allegations in this Indictment.  (Doc. 103, p. 76).  Mihaela Neta was the chief of budget service.  (Doc. 103, p. 76).  She was required to approve invoices by Olaeru at Necolaiciuc's direction.  (Doc. 103, p. 76-77).  Neta refused to state that the proper authorities approved the invoices in that it was BEI funds which were not being used

12

for the correct purpose.  (Doc. 103, p. 76-77).  Neta was fired for refusing to follow Necolaiciuc's orders. (Doc. 103, p. 77).

Constantin Radulescu, the former chief of the supply service at the CF regional branch, Timisoara provided a statement that thousands of tons of stainless steel pipes and plates were purchased but were not necessary to the regional branch, and these pipes and plates had been stored in stock at the regional branch. (Doc. 103, p. 77).  These items were not purchased at auction even though the value of the items indicated that they should have been purchased at auction.  (Doc. 103, p. 78).

Maria Caprioreanu was a former administrator at the Bucharest supply base of CFR.  (Doc. 103, p. 79).  She left her employment because  she was forced to sign invoices when she had not see the goods delivered or the goods were delivered in stages. (Doc. 103, p. 79).  Her supply area was forced to receive goods that it did not need before being permitted to receive goods that it did need.  (Doc. 103, p. 79-80).

Carmen Loga was the chief of supply services at Brasov.  (Doc. 103, p. 80).  This branch received supplies that were supposed to be consumed, however these supplies could not be consumed for various reasons including they were the incorrect dimensions or poor quality.  (Doc. 103, p. 80).   Loga attended a meeting with Necolaiciuc and Misir where she was told to consume the items supplied and was banned from making any types of purchase.  (Doc. 103, p. 80).  The regional branches would ask for one type of item and receive something else.  (Doc. 103, p. 80).

Marian Oltean was a former technician with the supply base.  (Doc. 103, p. 81).  The supply bases did not have sufficient storage areas to hold the supplies that were sent.  (Doc. 103, p. 81).  Necolaiciuc and Misir would not allow the employees to question any of the supplies that were sent, and the employees were threatened with firing if the employees made any comments.  (Doc. 103, p. 81).

Ionel Filimon was the director at Galati regional branch and complained to the supply director that

13

he had received large quantities of a certain item which were of poor quality, and received items in large quantities for prices much higher than market value.  (Doc. 103, p. 82).  He described paint that was received that was not waterproof, and pumps that were totally useless.  (Doc. 103, p. 83).

Georges Apostol, former director at CFR Iasi branch stated that he received supplies that were not needed and did not get the supplies needed, and the supplies were of poor quality.  (Doc. 103, p. 84).

Christina Biet, assistant economy director at the supply house stated that the employees were warned not to ask who the suppliers were nor ask questions about the prices of the supplies.  (Doc. 103, p. 85).

Luciana Chechi, was the former secretary of the trade director Misir.  (Doc. 103, p. 86-87).  Misir told her that she was designated to participate in the BRM auction by Necolaiciuc.  (Doc. 103, p. 87).  She was shown a paper with Necolaiciuc's signature designating her to participate in the BRM auction.  (Doc. 103, p. 87).  Chechi had no experience at a public auction.  (Doc. 103, p. 87).  Misir attended the auction and made the final decision as to the choice of supplier, the price, and the quantity purchased.  (Doc. 103, p. 88).  Chechi did not understand the products purchased, even though it was her signature on the document.  (Doc. 103, p. 88).  Misir told her to sign the document.  (Doc. 103, p. 89).

Teofil Dumitrescu was the chief of the auctions contracts department at CFR.  (Doc. 103, p. 89).  He is an attorney and stated that the auction department was just a cover.  (Doc. 103, p. 89).  The auction department was formed after SMF dissolved in 2002.  (Doc. 103, . 89-90).  It was the responsibility of the auction department to handle the acquisitions, however, only insignificant auctions occurred through this department.  (Doc. 103, p. 90).  Dumitrescu worked for SMF before it dissolved, and he noted that Necolaiciuc dealt directly with public acquisitions, avoiding SMF.  (Doc. 103, p. 90). Necolaiciuc was to set up an auction department when SMF dissolved, and he did set one up eventually, however, he had

14

direct control over the auction procedure.  (Doc. 103, p. 90).

Marin Negoita was the former director general at the general directorate of public works, the ministry.  (Doc. 103, p. 90-91).  The Ministry of Transport issued an order that all goods purchased must be made through certain commodity markets. (Doc. 103, p. 91-92).  The Ministry of Transport never approved many of the acquisitions and sales completed by Necolaiciuc and CFR never complied with Governmental Ordinance 60/2001.  (Doc. 103, p. 92).

Adrian Tolea provided a statement that Necolaiciuc purchased a mapping system that could have been purchased for 30% less.  (Doc. 103, p. 101).  He told Olaeru that an auction should be organized, and Olaeru reprimanded him.  (Doc. 103, p. 101-102).

Ille Vladut who was employed at CFR stated that three people were involved in the procurement of supplies, Olaeru, Misir and Necolaiciuc, but approvals were needed from Necolaiciuc.  (Doc. 103, p. 102).

Ms. Petcan was an economist at CFR and she stated that Necolaiciuc approved transactions without supporting documentation.  (Doc. 103, p. 103).  After Necolaiciuc left CFR, hundreds of payments were found without matching invoices.  (Doc. 103, p. 103).   Ms. Petcan also stated that provisions that were supposed to be in the custody of the unit at Basarab were actually in the custody of the suppliers.  (Doc. 103, p. 116).

Valentin Gabriel Ciuca was the general manager of SAAF for a period of time, and he indicated that he did not know how CFR took over and sold the 1500 passengers cars at a price below scrap metal, but he knew that Necolaiciuc had completed the sale.  (Doc. 103, p. 104).

Mr. Cosma was the general manager of SAAF for a period of time, and he was unaware of the assignment of debt relating to SAAF, Banc Post and CFR.  (Doc. 103, p. 104).  Necolaiciuc informed

Cosma of the assignment, and Cosma was unable to convince Necolaiciuc to accept a payment plan in lieu of selling the collateral.  (Doc. 103, p. 104).

Gabriel Toma worked for SMF and stated that Necolaiciuc did not work with SMF, was not overseen by SMF, and did not send his contracts to be approved by SMF.  (Doc. 103, p. 105).  He stated that Necolaiciuc's use of BRM was illegal.  (Doc. 103, p. 104).

Orlando Craciun, was the external financing project director for CFR, and he indicated that payments could only be made if approved by Necolaiciuc and Necolaiciuc paid suppliers according to his own preferences.  (Doc. 103, p. 106).  He stated that Necolaiciuc used BEI funds unlawfully for the purchase of items that were not approved as part of the loan.  (Doc. 103, p. 111).  Cracium also stated that railway switches purchased by Necolaiciuc were useless.  (Doc. 103, p. 111).

Beatrice Manolescu, the chief of the financial analysis system of CFR, approved five of the invoices for the mapping system from Rom Tehno Invest.  (Doc. 103, p. 111-112).   She felt pressured by Olaeru, and she saw that Olaeru had  blank payment orders which were signed by Necolaiciuc.  (Doc. 103, p. 122).

Iona Paliu, chief of the Budget Financial Analysis Service of the Railway Unit, Bucharest stated that Necolaiciuc and Olaeru made payments to suppliers without the approval of SMF.  (Doc. 103, p. 112).

Nicolae Ciovica, the manager of the CFR unit at Bucharest stated that three people made the decisions about payments and acquisitions, Necolaiciuc, Misir, and Olaeru.  (Doc. 103, p. 113).  Items were sent to the Bucharest that were not needed and could not be used.  (Doc. 103, p. 113).

Corneilu Cretu, the chief of budget services under Olaeru stated that suppliers went directly to Necolaiciuc, and then Necolaiciuc ordered payment without any verification.  (Doc. 103, p. 113).

Viorica Olaeru, was the economic manager at CFR and provided a statement that all payments were made by order of Necolaiciuc.  (Doc. 103, p. 101).  Olaeru stated that Necolaiciuc told her what suppliers

to use and the amounts to be paid, and these payments were made without invoices.  (Doc. 103, p. 114).

Olaeru signed orders  as directed by Necolaiciuc and when she refused, Necolaiciuc talked to her and she

was under great pressure from Necolaiciuc.  (Doc. 103, p. 114).

Alina Unguroiu worked at CFR and was aware of the problems with BRM and the lack of

supporting documentation.  (Doc. 103, p. 114).  She received orders signed by Necolaiciuc, however, he

was supposed to be the last person to approve the orders, and instead the orders were signed by him prior

to other signatures.  (Doc. 103, p. 114-115).

Julian Mantescue worked at SMF, and organized procurements for CFR.  (Doc. 103, p. 115).

Necolaiciuc acquired products that were not useful, could not be sold, and were purchased at too high of

a price.  (Doc. 103, p. 115).  Necolaiciuc also sold items for too low a price without following procedures.

(Doc. 103, p. 115).


### III.  Evidence Presented by Necolaiciuc

The Court allowed Necolaiciuc wide latitude in presenting evidence in this case.  The Court will

summarize the evidence presented, however, in rendering its decision, the Court only considered the

evidence that explained rather than contradicted Romania's proof.  Necolaiciuc presented the testimony

of Professor Ion Turcu who was retained as an expert witness in this case.  (Doc. 104, p. 147-148).

Professor Turcu is an attorney in Romania.  (Doc. 104, p. 148). He was a judge in the "Town Court" which

is a court of general competency during the communist regime.  (Doc. 104, p. 149).  He was promoted to

a judge of the "County Court."  (Doc. 104, p. 149).  He had both criminal and civil cases.  (Doc. 104, p.

150).  He then became the vice-president of the Appellate court until he retired.  (Doc. 104, p. 150).  He

was also elected to the "Supreme Counsel of the Magistrature" which handled disciplinary matters and

promoted people to different positions.  (Doc. 104, p. 151).  Professor Turcu also is a professor at the university.  (Doc. 104, p. 152).  Professor Turcu handled a few thousand criminal cases as a judge and has published several books on legal issues.  (Doc. 104, p. 152-153).

Professor Turcu testified that the Romanian/United States Extradition Treaty permits extradition for any crime that is punishable for a period of incarceration of one year or more.  (Doc. 104, p. 162). Professor Turcu asserted that the statutes listed in Indictments 17/P/2005, and 206/P/2006 have penalties of incarceration of over one year, however, the deeds mentioned in the Indictments do not fall under these statutes.  (Doc. 104, p. 164).  If a new law is passed which entails a criminal punishment, and if there is no other statute which encompasses this law, then it will fall under Article 248.  (Doc. 104, p. 173).  When Ordinance 60/2001was enacted, some offenses were punishable in excess of a year in prison.  (Doc. 104, p. 175).  Professor Turcu testified that Ordinance 60/2001 was overturned or replaced by Emergency Ordinance 34/2006.  (Doc. 104, p. 176).  Ordinance 34/2006 was enacted after Necolaiciuc left his position with CFR.  (Doc. 104, p. 178).  Ordinance 34/2006 made the same deeds that were committed and considered felonies under Ordinance 60/2001 to be misdemeanors rather than felonies. (Doc. 104, p. 178). In essence, Ordinance 34/2006 decriminalized the same conduct that was a felony under Ordinance 60/2001.  (Doc. 104, p. 178).

Professor Turcu testified that there is a constitutional principle in Article 15, Paragraph 2 of the Romanian Constitution that a more favorable criminal law is retroactive.  (Doc. 104, p. 179-180).   If conduct was considered criminal and then the legislature determined that it was no longer a criminal act, then the law would apply retroactively.  (Doc. 104, p. 179-180).  In this case, even if the conduct of Necolaiciuc was considered a criminal act pursuant to Ordinance 60/2001, when Ordinance 34/2006 was passed decriminalizing it, Ordinance 34/2006 would apply retroactively to Necolaiciuc's case and his

conduct would no longer be considered criminal.  (Doc. 104, p. 180).  In Professor Turcu's opinion, Necolaiciuc's conduct no longer carries a penalty in excess of one year in prison. (Doc. 104, p. 180).

Article 10 of the law 78/2000 provides that one element of the offense is that it must be committed for the purpose of obtaining money, goods or undue advantages for himself or for another person.  (Doc. 104, p. 182-183).  Professor Turcu asserted that even before any payments were made in this case, "they" knew that the funds were destined for different purposes. (Doc. 104, p. 184).  He claimed that these were accounting error and not felony crimes.  (Doc. 104, p. 184).  Professor Turcu testified that there must be corruption to have a crime.  (Doc. 104, p. 184-185).

According to Professor Turcu, Necolaiciuc and CFR did not have to use the services of SMF exclusively.  (Doc. 104, p. 198).  By providing witness statements, the Romanian Government violated Article 78 of the criminal procedure law in that a witness cannot prove a legal norm.  (Doc. 104, p. 199). For example, Mr. Popescu was in charge of the Installations Department and had nothing to do with purchases, yet his opinion included comments regarding the field of procurements even though he was not responsible for procurements.  (Doc. 104, p. 199).  Professor Turcu found orders of the Ministry of Transportation in which CFR was required to use BRM.  (Doc. 104, p. 200).  Further, there were no provisions which require CFR to use SMF.  (Doc. 104, p. 200). Professor Turcu testified that CFR acted lawfully in taking over the loan of SAAF and the law permitted CFR to sell the collateral at any time without notice and without SAAF being insolvent. (Doc. 104, p. 203-204).  However, SAAF was insolvent because it was not able to pay its debt.  (Doc. 104, p. 204-205).  CFR was within its rights to sell the collateral. (Doc. 104, p. 205).  Professor Turcu noted some inaccuracies in the witness statements, and in the Indictments.  (Doc. 104, p. 207-210).  Under Romanian law, a criminal act requires intent.  (Doc. 104, p. 215).

19

The purpose of Ordinance 60/2001 and Government Emergency Order 34 is to protect the public funds against abuses which may be done by some managers of the companies that are subsidized by the government.  (Doc. 105, p. 224-225).  It is to prevent the funds from reaching a different destination than initially set up for them.  (Doc. 105, p. 224).  Professor Turcu testified that it is difficult to determine which entities are subject to these ordinances and in his opinion CFR would not be subject to these ordinances. (Doc. 105, p. 226).  He based his opinion on the fact that the main stockholder of CFR is the Ministry of Transportation and a similar case in the Romanian courts found that these ordinances would not apply in this type of situation.  (Doc. 105, p. 226).  The Romanian judges that reviewed this case did not include a discussion of the decriminalization of conduct in Government Emergency Order 34 or Government Order 60/2001.   (Doc. 105, p. 240).   The Romanian judges also did not address whether the Romanian Commodity Exchange was a regulated entity.  (Doc. 105, p. 241).

## IV.  Standard of Review

International extradition proceedings are governed by 18 U.S.C. §3181, *et seq.* and by treaty.  In applying an extradition treaty, the Court is to construe it liberally in favor of the requesting nation. *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 14, (1936)*, Factor v. Laubenheimer*, 290 U.S. 276 (1933).  In an extradition matter, the court does not determine the guilt or innocence of the accused, but rather determines whether the following elements have been satisfied in order to support extradition: 1) there is a valid extradition treaty between the United States and the requesting country; 2) the individual arrested is the individual sought; 3) the offense charged is extraditable; 4) the requirement of "dual criminality" is met; 5) there is probable cause to believe that the defendant committed the offenses charged; 6) the required documents have been presented, translated, and duly authenticated by the United States

20

Consul; and 7) all other procedures have been followed. *In the Matter of the Extradition of Jacques Pelletier*, 2010 WL 1459720, *1 (S.D. Fla., Apr. 12, 2010).

"'[The] fugitive's right to present evidence at the hearing on extradition is severely limited. He or she may only present evidence that explains rather than contradicts the demanding country's proof.'" *United States v. Cardoso*, 2005 WL 1228826, *4 (M.D. Fla. May 10, 2005) (quoting *United States v. Fernandez-Morris*, 99 F.Supp. 2d 1358, 1366 (S.D. Fla. 1999)).   After a court determines that a fugitive is extraditable, then the final decision to surrender the fugitive rests with the Secretary of State.  *Id*. (citing 18 U.S.C. §3186).

The following issues have been previously determined by the Court, and therefore the Court finds that: 1) there is a valid extradition treaty between the United States and Romania;  2) Mihai Necolaiciuc is the person arrested and is the same person that is sought in the Romanian Indictments and arrest warrant; and, 3) the required documents have been presented, translated, and duly authenticated by the United States Consul.  The issues that remain for determination are whether: 1) the offenses of Abuse of Office and Misuse of Subsidies are extraditable offenses;  2) the requirements of dual criminality are met; and, 3) there is probable cause to believe that Necolaiciuc committed the offenses charged.

## V.  Analysis

### A.  Whether Abuse of Office and Misuse of Subsidies are Extraditable Offenses

"An extradition treaty creates in a foreign government the right to demand and obtain extradition of an accused criminal."  *United States v. Fernandez-Morris*, 99 F.Supp. 2d 1358, 1360 (S.D. Fla. 1999), (citing, *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir.) *cert. denied,* 479 U.S. 882, (1986)).  A court must

view challenges to extradition with a view to finding the offense charged within the terms of the treaty. *Id*.

Pursuant to Article 2 of the Treaty, "[a]n offense shall be an extraditable offense if it is punishable under the laws in both Parties by deprivation of liberty for a period of more than one year or by a more severe penalty. Where the request is for enforcement of the sentence of a person convicted of an extraditable offense, the deprivation of liberty remaining to be served must be at least four months." (Gov. Exh. 1, p. 23). Therefore, to be an extraditable offense, the offense must be punishable by a term of imprisonment of more than one year. Necolaiciuc argues that the crimes for which he is charged are minor and are not punishable by imprisonment of more than one year.

In Indictment 17/P/2005, Romania has charged Necolaiciuc with seven (7) substantive counts identified using letters A through G. (Gov. Exh. 1, p. 108-220). In each Count, Necolaiciuc is charged with the Offense of Abuse of Office Against Public Interests in Continuous and Qualified Form in violation of Art. 248 and Art. 41, subparagraph 2 of the Romanian Penal Code, and additionally in some Counts with Using Subventions for Other Purposes Than Those They Had Been Granted For in Continuous Form, in violation of Art.10(c) from Law No. 78/2000 and Art. 41 subparagraph 2 of the Romanian Penal Code. (Gov. Exh. 1, p. 108-220). These offenses are punishable by imprisonment from 5 to 15 years. (Gov. Exh. 1, p. 82).

In Indictment 134/P/2005, Romania has charged Necolaiciuc with separate offenses of Abuse of Office Against the Public Interests in Continuous and Qualified Form in violation of Art. 248, and Art. 41 paragraph 2 of the Romanian Criminal Code, and Using Subventions for Other Purposes Than Those They Had Been Granted For, in violation of Art. 10(c) form Law No. 78/2000 of the Romanian Penal Code. (Gov. Exh. 1, p. 769-833). These offenses are punishable by imprisonment from 5 to 15 years. (Gov. Exh.

1, p. 82).

In Provisional Arrest Warrant No. 206/P/2006, Romania has charged Necolaiciuc with the offenses of Using the Subventions for Other Purposes than Those for which They had been Granted as well as the Use for Other Purposes of the Guaranteed Credits from Public Funds or Which Are to be Reimbursed from Public Funds in violation of Art. 10(c) of Law No. 78/2000, Art. 41, (2)(Cc), and Abuse of Office in Qualified Form in violation of Art. 248(Cc), all with application of Art. 33 of the Romanian Penal Code. (Gov. Exh. 1, p. 1126).  These offenses are punishable by imprisonment from 5 to 15 years.  (Gov. Exh. 1, p. 1128).

Necolaiciuc asserts that if any actual crimes were committed these crimes are minor and not punishable by imprisonment.  This argument, however, is a defense to the crimes alleged to have been committed.  As alleged, the crimes carry punishments of imprisonment of five to fifteen years which exceed the one year requirement in the Treaty.  The Court determines that the crimes alleged in the two Indictments and the Provisional Arrest Warrant are extraditable offenses and satisfy the requirement in the Treaty that the crimes alleged be punishable by deprivation of liberty of more than one year.

## B.  Dual Criminality

The Court must consider whether the requirements of dual criminality are met.

Dual criminality refers to the characterization of the relator's criminal conduct insofar as it constitutes an offense under the law of the respective states . . .  "Double criminality" is in effect a reciprocity requirement which is intended to ensure each of the respective states that they (and the relator) can rely on corresponding treatment, and no state shall use its processes to surrender a person for the conduct which it does not characterize as criminal.

*United States v. Fernandez*, 99 F.Supp.2d 1358, 1369 (S.D. Fla., 1999), (citing *United States v. Gallo-*

*Chamorro*, 48 F.3d 502, 507 (11th Cir. 1995)).  In the Treaty, Article 2, provides that "[a]n offense shall be an extraditable offense if it is punishable under the laws in both Parties by deprivation of liberty for a period of more than one year or by a more severe penalty."  (Gov. Exh. 1, p. 23).   Paragraphs 3 provides in part that, "[f]or purposes of this Article, an offense shall be an extraditable offense: (a) whether or not the laws in the Requesting and Requested States place the acts or omissions constituting the offense within the same category of offenses or describe the offense by the same terminology."  (Gov. Exh. 1, p. 23). The Treaty requires that the Court determine if there is a corresponding criminal statute in the United States for the crimes alleged in the charging documents.

For the requirement of dual criminality to be met, the conduct charged must be a crime in both the requesting and refuge state.  *Polo v. Horgan*, 828 F.Supp. 961, 962 (S.D. Fla., 1993). The Court must focus on the alleged conduct of Necolaiciuc to determine if this conduct constitutes a crime in the United States. The Court need not consider the title of the offense, but rather must consider the alleged conduct itself.

### 1. The Offenses in the United States

The United States asserts that the offenses alleged in 17/P/2005, 134/P/2005, and 206/P/2006 are prohibited by various sections of the United States Code, specifically 18 U.S.C. §641, §654, and §660. The Romanian Indictments and the Provisional Arrest Warrant allege that Necolaiciuc embezzled, misapplied and converted to his use or the use of another, money, credit or things of value of Romania.

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted–
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for

24

which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.
        The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

18 U.S.C. §641.  The United States has presented evidence showing the Necolaiciuc's signature was on documents  showing that he embezzled or misapplied funds or purchased items and sold them which was a misapplication of funds pursuant to Romanian law. Further, the United States presented evidence that Necolaiciuc directed the purchase of worthless supplies.  Specifically the transaction regarding SAAF wherein Necolaiciuc improperly used funds to payoff a loan held by SAAF and then Necolaiciuc illegally sold the 1500 railway cars that collateralized a loan, without giving SAAF the opportunity to payoff the loan.  Further, Necolaiciuc used the BEI funds for purposes other than the funds were intended. Necolaiciuc did not use the funds for flood reparation of the railway system. The facts of the case show Necolaiciuc has the criminal intent necessary to establish a crime in both Romania and the United States. for each Count in the two Indictments and the Provisional Arrest Warrant.

The United States alleges that the conduct of Necolaiciuc also violates 18 U.S.C. §654 which provides,

Whoever, being an officer or employee of the United States or of any department or agency thereof, embezzles or wrongfully converts to his own use the money or property of another which comes into his possession or under his control in the execution of such office or employment, or under color or claim of authority as such officer or employee, shall be fined under this title or not more than the value of the money and property thus embezzled or converted, whichever is greater, or imprisoned not more than ten years, or both; but if the sum embezzled is $1,000 or less, he shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. §654.  The Government alleges that Necolaiciuc's actions violated 18 U.S.C. §654 by Necolaiciuc being an employee of CFR which was under the control of the Romanian Government and

converting or embezzling property belonging to Romania. CFR is alleged to be controlled by the Romanian Government and Necolaiciuc was an employee of CFR. Necolaiciuc is alleged to have embezzled property of CFR for his own purposes when he purchased useless supplies, sold assets below market price, and conducted business with shell or ghost corporations. The facts alleged show that Necolaiciuc's conduct establishes a crime in both Romania and the United States.

The United States also alleges that Necolaiciuc's conduct violated 18 U.S.C. §660, which provides,

> Whoever, being a president, director, officer, or manager of any firm, association, or corporation engaged in commerce as a common carrier, or whoever, being an employee of such common carrier riding in or upon any railroad car, motortruck, steamboat, vessel, aircraft or other vehicle of such carrier moving in interstate commerce, embezzles, steals, abstracts, or willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, securities, property, or assets of such firm, association, or corporation arising or accruing from, or used in, such commerce, in whole or in part, or willfully or knowingly converts the same to his own use or to the use of another, shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. §660. The Government argues that Necolaiciuc was the general manager of the railways of Romania which are common carriers. In the charging documents, Romania asserts that Necolaiciuc misapplied funds, credits and assets of the railway of Romania and converted these funds to his own use or the use of another. Specifically, when Necolaiciuc rented 10 locomotives and 150 rail cars without a fee, Necolaiciuc willfully misapplied assets of CFR and converted those assets for his own use or the use of another. In addition, the misappropriation of BEI funds also violated this statute. The Court determines that the United States on behalf of the Romanian Government has established that the conduct of Necolaiciuc constitutes a crime in both Romania and the United States.

### C.  Probable Cause

In an extradition proceeding, the foreign country does not have to provide evidence that the defendant is actually guilty, rather it must provide evidence establishing probable cause to believe that the defendant is guilty.  *In the Matter of the Extradition of Jacques Pelletier*, 2010 WL 1459720, *3 (S.D. Fla., Apr. 12, 2010).  To determine if probable cause exists, the Supreme Court determined that the same standard of probable cause used in preliminary examinations is applicable.  *Id.* (citing *Benson v. McMahon*, 127 U.S. 457, 462-63 (1888)).  The Court must find "probable cause that the evidence is sufficient to sustain a charge."  *In the Matter of the Extradition of Jose Franciso Cifuentes Gonzales*, 2010 WL 1330128, *2 (S.D. Fla., Mar. 29, 2010). "'Probable cause is established when the evidence presented supports a reasonable belief that a fugitive committed the charged offenses.'" *United States v. Peterka*, 307 F.Supp. 2d 1344, 1349 (M.D. Fla. 2003) (citing *In re the Matter of Extradition of Lehming*, 951 F.Supp. 505, 514 (D. Del., 1996)).  Hearsay is an acceptable basis for a probable cause determine in extradition proceedings.  *Id.*  The function of this Court is determine if there is competent evidence to show probable cause.  *Escobedo v. U.S.*, 623 F.2d 1098, 1102 (5th Cir. 1980).  "'The weight and sufficiency of that evidence is for the determination of the committing court.'" *Id.*

The United States submitted copies of witness statements in support of the charges.  In summary, the witnesses stated that Necolaiciuc directed some of them to falsify invoices and accept inferior supplies.  Necolaiciuc directed them to use companies not authorized by statute to purchase and sell assets of CFR, and to use funds from BEI that were authorized for flood reparations for other purchases not related to the reparation.  Supplies were purchased at inflated prices and inferior quality, and then asset were undervalued when sold.  Necolaiciuc dealt with companies that were shell or ghost corporations and these corporations failed to pay their invoices.  Payments were authorized by Necolaiciuc without proper invoices.  Witness

27

statements tie Necolaiciuc to these fraudulent transactions.  The Court finds that the United States on behalf of the Romanian Government has presented sufficient evidence to show that probable cause exists to support a reasonable belief that Necolaiciuc committed crimes which constitute the charges in each Count of the Indictments 17/P/2005a and 134/P/2005, and the charges in the Provisional Arrest Warrant 206/P/2006.  Therefore, the Court finds that probable cause exists to believe that Necolaiciuc committed the following offenses in violation of the Romanian Penal Code as charged in the Indictments and Provisional Arrest Warrant: Abuse of Office Against Public Interests With Very Serious Consequences in Continued Form in violation of Art. 248 and Art. 41(2) and the offense of Using Subventions for Other Purposes Than Those They Were Granted For in Continuous Form, in violation of Art. 10(c) from Law No. 78/2000 and Art. 41(2) all with the application of Article 33(a) of the Romanian Criminal Code.

### III.  Conclusions

Based on the foregoing, this matter is certified to the Secretary of State in order that a warrant may issue, upon the requisition of the proper authorities of Romania, for the surrender of Mihai Necolaiciuc on the charges relating to Abuse of Office Against Public Interests With Very Serious Consequences in Continued Form in violation of Art. 248 and Art. 41(2) and the offense of Using Subventions for Other Purposes Than Those They Were Granted For in Continuous Form, in violation of Art. 10(c) from Law No. 78/2000 and Art. 41(2) all with the application of Article 33(a) of the Romanian Criminal Code according to the provisions  of the Extradition Treaty With Romania and Protocol to the Treaty on Mutual Legal Assistance in Criminal Matters With Romania.

**IT IS HEREBY ORDERED:**

1) The Request for Extradition (Doc. 10) filed on August 21, 2009 is **GRANTED** as to all charges.

2)  The Superceding Request for Extradition (Doc. 57) filed on February 4, 2010 is **GRANTED** as to all charges.

3) Mihai Necolaiciuc is committed to the custody of the United States Marshal, or his authorized representative, to be confined in appropriate facilities and to remain there until he is surrendered to Romania pursuant to applicable provisions of the extradition treaty and law.

4) The United States Attorney for the Middle District of Florida shall forward a copy of this Certification and Order, together with a copy of all transcripts of proceedings and copies of documents received into evidence in this matter to the Secretary of State.


**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this __1st__ day of __March__, 2010.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE


Copies: All Parties of Record

29